Jeremiah M. Hudson
Fisher Hudson Shallat
jeremiah@fisherhudson.com
ISB No. 8364
950 W. Bannock St., Suite 630
Boise, ID 83702
208-345-7000

W. James Mac Naughton, Esq.
wjm@wjmesq.com
NJSB No. 000701985
7 Fredon Marksboro Road
Newton, NJ 07860
732-213-8180
*Attorneys for Plaintiff The Satanic Temple*

UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

_____

THE SATANIC TEMPLE

        Plaintiff

    v.

RAUL LABRADOR, in his
capacity as the Attorney General of
Idaho, JAN M. BENNETTS, in
her capacity as Ada County Prosecutor,
and THE STATE OF IDAHO

        Defendants

_____

Index No. 1:22-cv-411

**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

I.   Introduction ................................................................................................... 1

II.  *Dobbs* Does Not Preclude the Relief Sought by TST. .................................. 3

   A.   The Framer's Intent in the 18th and 19th Centuries is Irrelevant to This Case. ........... 3

   B.   *Dobbs* Did Not Eliminate a Woman's Fundamental Right to Decide When to Become Pregnant. ................................................................................................... 4

   C.   Being Pregnant Does Not Mean a Woman Consents to Be Pregnant. ........................ 6

III. TST Has Standing to Bring This Action. ...................................................... 8

   A.   TST Has Standing as a Prescriber of Abortifacients. ................................................ 9

   B.   TST Has Standing Because It Diverted Its Resources to Respond to the Idaho Abortion Bans. ................................................................................................... 11

   C.   TST Has Standing Represent its Members. ............................................................. 12

      1. TST Members Have Standing to Sue in Their Own Right. ................................. 12

      2. TST Does Not Have to Reveal the Identity of Its Members. ............................... 14

      3. The Interests TST Seeks to Protect Are Germane to Its Purpose. ....................... 15

IV. The Idaho Abortion Bans Cause the Unconstitutional Taking of a Woman's Property Right to Exclude a Prenatal Person from Her Uterus. ................................ 15

   A.   The Use and Occupancy of a Uterus is a Property Interest. ..................................... 15

   B.   The Costs of the Idaho Abortion Bans Should Be Borne by the State. ..................... 17

   C.   The Right to Exclude a Prenatal Person from the Uterus is a Property Interest. ...... 18

   D.   The Idaho Abortion Bans Take a Woman's Property Right To Exclude a Prenatal Person From Her Uterus. ................................................................................... 19

   E.   An Injunction is an Appropriate Remedy for Count One. ........................................ 20

V.   The Idaho Abortion Bans Force Involuntarily Pregnant Women into Involuntary Servitude… ................................................................................................... 22

VI.  Count Three States a Claim for Violation of the Equal Protection Clause. .................. 23

VIII. Conclusion. ................................................................................................... 25

## Table of Authorities

**Cases**

*Am. Unites for Kids v. Rousseau*, 985 F.3d 1075 (9th Cir. 2021).................................................. 12

*Anderson v. Morrow*, 371 F.3d 1027 (9th Cir. 2004)......................................................... 5

*Armstrong v. State*, 296 Mont. 361 (1999) ............................................................... 16

*Bailey v. Alabama*, 219 U.S. 219 (1911) ............................................................. 21, 22

*Blake v. Cruz*, 108 Idaho 253 (1985) .................................................................... 2

*Bostic v. Schaefer*, 760 F.3d 352 (4th Cir. 2014).......................................................... 13

*Carey v. Population Services International*, 431 U.S. 678 (1977)................................................. 9

*Carroll v. Princess Anne*, 393 U.S. 175 (1968)........................................................... 24

*Carson Harbor Village Ltd. v. City of Carson*, 37 F.3d 468 (9th Cir. 1994) ............................... 21

*Catholic League v. City of San Francisco*, 624 F.3d 1043 (9th Cir. 2010) ................................... 13

*Cedar Point Nursery v. Hassid*, 594 U.S. ___, 141 S. Ct. 2063 (2021) ...................................... 19

*Central Delta Water Agency v. U.S.*, 306 F.3d 938 (9th Cir. 2002) ........................................ 15

*Dobbs v. Jackson Women's Health Organization*, 597 U.S. _, 142 S. Ct. 2228 (2022) ........ passim

*Doe v. Bolton*, 410 U.S. 179 (1973).................................................................... 10

*Dunn v. Blumstein*, 405 U.S. 330 (1972) ................................................................ 22

*E. Bay Sanctuary Covenant v. Barr,* 964 F.3d 832 (9th Cir. 2020).............................................. 11

*Eisenstadt v. Baird*, 405 U.S. 438 (1972) ............................................................. 5, 6

*Fair Hous. of Marin v. Combs*, 285 F.3d 899 (9th Cir. 2002)...................................................... 11

*First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles*, 482 U. S. 304
  (1987)................................................................................................ 17

*Griswold v. Connecticut*, 381 U.S. 479 (1965)............................................................... 5

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ...................................................... 9

*Hayden Lake Recreational Water & Sewer Dist. v. Haydenview Cottage, LLC*, 835 F. Supp. 2d 965 (D. Idaho 2011) ................................................................................................ 11

*Horne v. Dept. of Agriculture* , 576 U.S. 350 (2015) ................................................................ 18

*Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333 (1977) ............................. 9, 12, 15

*Johnson v. Boise City*, 87 Idaho 44 (1964) ............................................................................ 20

*KMST, LLC v. Cnty. Of Ada,* 138 Idaho 577 (2003) .............................................................. 20

*Knick v. Twp. Of Scott, Pa*., 139 S. Ct. 2162 (2019) ............................................................ 20

*Latta v. Otter*, 771 F.3d 456 (9th Cir. 2014) ......................................................................... 4

*Lawrence v. Texas*, 539 U.S. 558 (2003) ............................................................................ 5, 23

*Lingle v. Chevron U. S. A.*, 544 U.S. 528 (2005) ............................................................ 17, 18, 18

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) ............................... 18, 19

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992) ........................................... 19

*Maria v. Surbaugh*, 23 Va. 228, 1824 WL 1192 (1824) ......................................................... 21

*Marty v. State*, 117 Idaho 133 (1990) .................................................................................. 16

*McCormack v. Hiedeman*, 900 F. Supp. 2d 1128 (D. Idaho 2013), aff'd sub nom, *McCormack v. Herzog*, 788 F.3d 1017 (9th Cir. 2015) ................................................................................ 9, 11

*Nash v. Meyer*, 54 Idaho 283 (1934) ..................................................................................... 2

*Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032 (9th Cir. 2015): ..................................... 14

*Nelsen v. Nelsen*, 508 P.3d 301 (2022) .................................................................................. 17

*Oregon Advocacy Center v. Mink*, 322 F.3d 1101 (9th Cir. 2003) ............................................ 12

*Otay Mesa Prop., L.P. v. United States*, 670 F.3d 1358 (Fed. Cir. 2012) ................................. 17

*Pete v. United States*, 569 F.2d 565 (Fed. Cir. 1978) ........................................................... 20

*Peyote Way Church of God, Inc. v. Smith*, 742 F.2d 193 (5th Cir. 1984) ................................. 10

*Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908 (9th Cir. 2004) ......................... 10

*Plyler v. Doe*, 457 U.S. 202 (1982)............................................................................ 22

*Roe v. Wade* 410 U.S. 113, 134 (1973)............................................................ 4, 5, 6, 13

*San Antonio School District v. Rodriguez*, 411 U.S. 1 (1973).................................... 22

*San Diego Gas Electric Co. v. San Diego*, 450 U.S. 621 (1981)........................... 17, 19

*Seeboth v. Allenby*, 789 F.3d 1099 (9th Cir. 2015)..................................................... 24

*Shackleford v. U.S.,* 262 F.3d 1028 (9th Cir. 2001)…………………………………………17

*Shwarz v. U.S.*, 234 F.3d 428 (9th Cir. 2000). .............................................................. 3

*Spokeo, Inc. v. Robins*, 538 U.S. 330, 136 S.Ct. 1540 (2016) ................................... 13

*St. Clair v. City of Chico*, 880 F.2d 199 (9th Cir. 1989)............................................. 15

*Steffel v. Thompson*, 415 U.S. 452 (1974) ................................................................... 8

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ................................................. 14

*U.S. v. Daniels*, 902 F.2d 1238 (7th Cir. 1990) ........................................................... 6

*U.S. v. Feekes*, 879 F.2d 1562 (7th Cir. 1989)............................................................. 6

*U.S. v. Seidman*, 156 F.3d 542 (4th Cir. 1998) ............................................................ 7

*Union Pacific Railway Co. v. Botsford*, 141 U.S. 250 (1891), ................................... 16

*United States v. A.H. Fischer Lumber Co.*, 162 F.2d 872 (4th Cir. 1947)..................... 1

*United States v. Kozminski*, 487 U.S. 931 (1988)........................................................ 22

*United States v. Garber*, 607 F.2d 92 (5th Cir. 1979)…………………………………………16

*United States v. Page*, 302 F.2d 81 (9th Cir. 1962) ..................................................... 7

*United States v. Thomas*, 724 F.3d 632 (5th Cir. 2013)................................................ 7

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*,
    454 U.S. 464 (1982)................................................................................................ 8

*Walls v. Cent.  Contra Costa Transit Auth.*, 653 F.3d 963 (9th Cir. 2011) .................. 7

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980) ....................... 16

*Wedges/Ledges of California, Inc. v. City of Phoenix*, 24 F.3d 56 (9th Cir. 1994) ........................ 9

*Witt v. Air Force*, 527 F.3d 806 (9th Cir. 2008) ........................................ 22

**Statutes**

Idaho Code § 18-606(1) ............................................................................... 9

Idaho Code § 18-607 .................................................................................... 8

Code § 18-8802(8) ..................................................................................... 18

Idaho Code § 18-8802(8). .......................................................................... 25

 Idaho Code § 39-3404……………………………………………………………...17

**Other Authorities**

Bridget J. Crawford, Taxation, Pregnancy, and Privacy, 16 Wm. & Mary J. Women & L. 327 (2010) ................................................................................................. 15

John Locke in Two Treatises of Government, Bk. II, § 87 (Gryphon special ed. 1994) (1698) .. 16

**Rules**

Fed.  R. Civ. Pro.  12(b)(6) ....................................................................... 3

**Constitutional Provisions**

Equal Protection Clause ........................................................................... 1, 2

Fourteenth Amendment ................................................................................. 3

Takings Clause……………………………………………………………...2, 8, 25

Thirteenth Amendment .................................................................. 2, 8, 21, 24

## I.    Introduction

This memorandum of law is submitted by Plaintiff The Satanic Temple ("TST") in opposition to Defendants' motion to dismiss, ECF No. 23 (the "Motion").  Defendants overstate the scope of *Dobbs v. Jackson Women's Health Organization*, 597 U.S. __, 142 S. Ct. 2228 (2022) ("*Dobbs*").  As a consequence, Defendants misconstrue the relief sought by TST.[1]  TST does not seek to "undo *Dobbs* by constitutionalizing abortion and removing it from the democratic process once again."  See Memorandum in Support of Motion to Dismiss, ECF No. 23-1 ("Defendants' Memo") at p. 20.

Rather, TST asks the Court to decide the weighty Constitutional issues that arise when the State of Idaho confers legal personhood on a zygote, thus creating a Prenatal Person.[2]  *Dobbs* did not address the constitutionality of such legislation.  *Dobbs*, 142 S.Ct. at 2261 ("Our opinion is not based on any view about if and when prenatal life is entitled to any of the rights enjoyed after birth.").

*Dobbs* said in its opening paragraph at 142 S.Ct. at 2240:

> Abortion presents a profound moral issue on which Americans hold sharply conflicting views.  Some believe fervently that a human person comes into being at conception and that abortion ends an innocent life.  Others feel just as strongly that any regulation of abortion invades a woman's right to control her own body and prevents women from achieving full equality.  Still others in a third group think that abortion should be allowed under some but not all circumstances, and

---

[1] Defendants argue "the wrong plaintiff is before the Court" because a filing in New Mexico identifies TST as "The Satanic Temple, Inc."  See ECF No. 23-2.  TST was incorporated as a Massachusetts religious organization in 2017 using the name "The Satanic Temple" and changed its name in 2019 to "The Satanic Temple, Inc."  See Declaration of Erin Helian dated April 26, 2023 (the "Helian Declaration") at ¶3.  TST respectfully requests leave to amend the First Amended Complaint ("Complaint"), if necessary, to clarify its current and proper name.  *United States v. A.H. Fischer Lumber Co.*, 162 F.2d 872, 874 (4th Cir. 1947) ("Under modern practice, if the right party is before the court, although under a wrong name, an amendment to cure a misnomer of parties will be allowed.")

[2] Capitalized terms have the same meaning as in the Complaint except as otherwise noted.

those within this group hold a variety of views about the particular restrictions that should be imposed.

*Dobbs* did not say, either expressly or by implication, that the political resolution of this profound moral issue is exempt from the traditional Constitutional limits found in the Takings Clause, the Involuntary Servitude Clause or the Equal Protection Clause. *United States of America v. State of Idaho*, Case No. 22-cv-328 DIH, slip op. August 24, 2022, at p. 37 ("*Dobbs* did not overrule the Supremacy Clause.")

The State of Idaho chose the side of those who "believe fervently that a human person comes into being at conception and that abortion ends an innocent life." The Idaho Abortion Bans create the Prenatal Person whose "unique . . . independent and distinct life" is protected by the full power and majesty of the State of Idaho from termination at any time by anyone, including the mother herself. Idaho Code §§ 18-606(2) and 18-8802(8). The statutes codify the long-standing view of the Idaho Supreme Court that an "unborn child" is a "human being." *Blake v. Cruz*, 108 Idaho 253, 261 (1985) ("This Court recently committed itself to the proposition that an unborn child is a person in being."); *Nash v. Meyer*, 54 Idaho 283, 301 (1934) ("The abortion statute . . . discourage[s] abortions because thereby the life of a human being, the unborn child is taken.").

This case asks the Court to address what rights, if any, does a woman have when her body is conscripted by the State of Idaho *without her consent* to incubate and give birth to a Prenatal Person. The answer to that question requires the Court to decide whether the Idaho Abortion Bans are unconstitutional because 1) the Abortion Bans take the property of an Involuntarily Pregnant Woman – the use of her uterus – without compensation in violation of the Takings Clause; 2) a woman who must remain pregnant and give birth without her consent is subject to involuntary servitude in violation of the Thirteenth Amendment; and 3) a woman who

is pregnant by accident is subject to the Idaho Abortion Bans while one who is pregnant by rape or incest is not in violation of the Equal Protection Clause.  In deciding whether the Complaint states a claim for relief for purposes of Fed.  R. Civ. Pro.  12(b)(6), the Court must construe the Complaint in the light most favorable to TST and accept all well-pleaded factual allegations as true.  *Shwarz v. U.S.*, 234 F.3d 428, 435 (9th Cir. 2000).

**II.    *Dobbs* Does Not Preclude the Relief Sought by TST.**

**A.  The Framer's Intent in the 18th and 19th Centuries is Irrelevant to This Case.**

Defendants repeatedly cite *Dobbs* in support of their argument that "this case is about abortion, from start to finish."  They argue *Dobbs* requires the Court to defer to the views of the "Framers" of the Fifth, Thirteenth and Fourteenth Amendments on all matters pertaining to abortion, including whether a woman has a property interest in the use of her uterus or is subject to involuntary servitude when her body is conscripted to incubate and birth a Prenatal Person. See Defendants' Memo at pp. 10 -12.  Defendants assert "[b]ecause there is no constitutional right to abortion, the States are free to regulate it as they see fit."  Defendants' Memo at p. 13.

But *Dobbs* decided only one narrow legal issue pertaining to abortion – whether the privacy interest a woman has in terminating her pregnancy is a fundamental liberty interest under the Fourteenth Amendment.  *Dobbs* did not address any of the other Constitutional rights asserted in this case.

*Dobbs* reviewed the history of abortion in the 18th and 19th Centuries and concluded a woman's privacy interest in terminating her pregnancy was not so "deeply rooted in our history and tradition" or "essential to our scheme of ordered liberty" as to rise to the level of a fundamental liberty interest.  *Dobbs* gave substantial deference to the 19th century bans on abortion – a century in which women did not have the right to vote, many could not own

property in their own name and married women could be legally raped by their husbands.  *Latta v. Otter*, 771 F.3d 456, 488 (9th Cir. 2014).

The Complaint details the process of how babies are created and grow once sexual intercourse is concluded.  See Complaint at ¶¶37 to 62.  That process was a complete mystery in the 19th Century.  See Declaration of Dr. J. D. dated April 24, 2023 (the "Dr. J.D. Declaration") at ¶4.[3]  Up until "quickening" - the first felt movement of the fetus in the womb – an "unborn child" in the 19th Century was regarded as part of the mother's body. *Roe v. Wade* 410 U.S. 113, 134 (1973) ("*Roe*").  "[M]any States in the late 18th and early 19th century did not criminalize pre-quickening abortions". *Dobbs*, 142 S.Ct. at 2236.  Scientific proof that fertilization (in a sea urchin) is due to the fusion of an egg and sperm cell did not exist until 1876.[4]  There is no scientific or legal basis from the 19th Century (much less the 18th Century) to support the determination by the State of Idaho that a human being comes into existence at conception.

### B.  *Dobbs* Did Not Eliminate a Woman's Fundamental Right to Decide When to Become Pregnant.

*Dobbs* did not address the development of reproduction technology since *Roe* or the freedom that technology gives women over their sexual and reproductive lives in the 21st Century.  That technology includes the invention of in vitro fertilization ("IVF"), gestational surrogacy, and the widespread use of a variety of birth control methods.  Unlike the 19th Century, women in the 21st Century readily control when they get pregnant.  They also can and do rent out their bodies to third parties as gestational surrogates.  In Idaho, a gestational surrogate gets a

---

[3] The original of the Dr. J.D. Declaration is filed under seal.

[4] https://www.bbvaopenmind.com/en/science/leading-figures/oscar-hertwig-the-first-man-to-observe-sexual-reproduction/, last visited December 23, 2022.

substantial amount of money to grant the use of her uterus to a third party to incubate a fetus to term.  See Dr. J.D. Declaration at ¶3.

Unlike the 19th Century, women in the 21st Century have unrestricted access to contraception, a fundamental privacy right. *Eisenstadt v. Baird*, 405 U.S. 438 (1972) ("*Eisenstadt*") and *Griswold v. Connecticut*, 381 U.S. 479 (1965) ("*Griswold*"). As a consequence, women using contraception can and do engage in sex just for the pleasure and intimacy it brings and without any purpose or intent to become pregnant ("Protected Sex").

*Dobbs* may have ended the fundamental privacy right to terminate a pregnancy granted by *Roe*.  But the right to engage in Protected Sex remains deeply woven into the Constitutional fabric as a fundamental right.  *Lawrence v. Texas*, 539 U.S. 558, 578 (2003) ("'[I]ndividual decisions by married persons, concerning the intimacies of their physical relationship, even when not intended to produce offspring, are a form of liberty protected by the Due Process Clause. Moreover, this protection extends to intimate choices by unmarried as well as married persons."); *Anderson v. Morrow*, 371 F.3d 1027, 1032 (9th Cir. 2004) ("The *Lawrence* Court held that the Due Process Clause of the Fourteenth Amendment protects the right of two individuals to engage in fully and mutually consensual private sexual conduct.").

*Dobbs* did not terminate the constitutional right to engage in Protected Sex.

Nothing in this opinion should be understood to cast doubt on precedents that do not concern abortion.  We have also explained why that is so: rights regarding contraception and same-sex relationships are inherently different from the right to abortion because the latter (as we have stressed) uniquely involves what *Roe* and *Casey* termed "potential life." [internal citations omitted]

*Dobbs*, 142 S.Ct. at 2280

Nor did *Dobbs* terminate a woman's fundamental right to choose when to become pregnant in the first instance. As the U.S. Supreme Court said in *Eisenstadt,* 405 U.S. at 453:

> If the right of privacy means anything, it is the right of the *individual,* married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to . . .  beget a child. [emphasis in original]

The Involuntarily Pregnant Women represented by TST engaged in Protected Sex.  By using contraception, they made the affirmative choice to not become pregnant by that encounter, thus exercising the fundamental rights guaranteed by *Eisenstadt, Griswold* and *Lawrence*.  Their birth control failed.  But that does not mean they consented to the use of their uteruses to carry and birth the Prenatal Person protected by the Idaho Abortion Bans.

### C.  Being Pregnant Does Not Mean a Woman Consents to Be Pregnant.

There is an inherent risk that a woman who engages in Protected Sex gets pregnant.  See Dr. J. D. Declaration at ¶8.  However, assuming that risk is not consent.  As the Court said in *U.S. v. Daniels*, 902 F.2d 1238, 1245 (7th Cir. 1990):

> [K]nowledge and consent are not synonyms.  Taking a risk is not the same as consenting to the consequences if the risk materializes.  A person who walks by himself late at night in a dangerous neighborhood takes a risk of being robbed; he does not consent to being robbed.

See also *U.S. v. Feekes*, 879 F.2d 1562, 1565 (7th Cir. 1989) ("To take a risk is not the same thing as to consent.").

*Dobbs* did not eviscerate a woman's fundamental right to engage in Protected Sex. *Dobbs* certainly did not strip a woman of her right to decide when to become pregnant in the first instance, guaranteed by *Eisenstadt*.

These are fundamental constitutional rights that cannot be surrendered by accident.  They can only be waived by an act of free will by the woman herself.  *U.S. v. Seidman*, 156 F.3d 542, 550 n.10 (4th Cir. 1998) ("Voluntary consent is the quintessential act of free will.").  As the U.S. Supreme Court held in *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) ("*Johnson*"):

[C]ourts indulge every reasonable presumption against waiver of fundamental constitutional rights and that we do not presume acquiescence in the loss of fundamental rights. A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of the [fundamental constitutional] right must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the [one who holds the right].

In *United States v. Page*, 302 F.2d 81, 83-84 (9th Cir. 1962), the Ninth Circuit said consent to waive a fundamental Constitutional right must be "unequivocal and specific and freely and intelligently given."

There must be convincing evidence that defendant has waived his rights. There must be clear and positive testimony. Courts indulge every reasonable presumption against waiver' of fundamental constitutional rights. [internal quotations omitted]

Thus, a woman who engages in Protected Sex, by definition, does not waive her fundamental Constitutional right to determine when she will become pregnant in the first instance.[5] *United States v. Thomas*, 724 F.3d 632, 643 (5th Cir. 2013) ("Courts indulge every reasonable presumption against waiver of fundamental constitutional rights and do not presume acquiescence in the loss of fundamental rights." [internal citations and quotations omitted]); *Walls v. Cent. Contra Costa Transit Auth.*, 653 F.3d 963, 969 (9th Cir. 2011) ("[A] wavier of [fundamental Constitutional rights] should not be implied and should not be lightly found. Waiver of a constitutional right must be knowing and voluntary." [internal citations and quotations omitted]).

Simply put, an Involuntarily Pregnant Woman does not consent to the use or occupancy of her body by a Prenatal Person for any purpose whatsoever. In the absence

---

[5] There is also a profound Constitutional question of whether a woman who engages in sex without Birth Control thereby consents to the creation of a Prenatal Person in her body. TST is not raising that issue in this case.

of her consent, the occupancy of a woman's uterus by a Prenatal Person takes her property in violation of the Takings Clause.  The work and services she must provide to incubate and deliver the Prenatal Person is involuntary servitude in violation of the Thirteenth Amendment.

### III.    TST Has Standing to Bring This Action.

TST has standing to bring this action because 1) it has suffered both actual and threatened injury as a result of the Idaho Abortion Bans; 2) the injury is fairly traceable to the Idaho Abortion Bans; and 3) TST's injury is likely to be redressed by a favorable decision by this Court.  *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982).

The Idaho Abortion Bans make an abortion using the Abortifacients necessary to engage in the Satanic Abortion Ritual a felony in Idaho.  Idaho Code § 18-606(1).  Even promoting the TST Clinic or the Satanic Abortion Ritual in Idaho is a misdemeanor under Idaho Code § 18-607 ("A person who . . . advertises . . . anything specially designed to terminate a pregnancy . . . commits a misdemeanor.").  This causes sufficient injury to both TST and its members to give them standing to challenge the constitutionality of the Idaho Abortion Bans.  Enjoining enforcement of the Idaho Abortion Bans will eliminate that injury.

Neither TST nor its members are required to first expose themselves to actual arrest or prosecution to have standing to challenge the Idaho Abortion Bans.  *Steffel v. Thompson*, 415 U.S. 452, 459 (1974).  Rather, TST intends to provide abortions using the Satanic Abortion Ritual to its members in Idaho, provided it can do so legally.  Helian Declaration at ¶25.  There are dozens Involuntarily Pregnant Women in Idaho who would engage in the Satanic Abortion Ritual if it was available.  Dr. J.D. Declaration at ¶12.  It is virtually certain TST and its members

would be prosecuted for promoting or engaging in the Satanic Abortion Ritual in Idaho, so they are not "required to await and undergo a criminal prosecution as the sole means of seeking relief." *Doe v. Bolton*, 410 U.S. 179, 188 (1973).

TST has standing to make the claims in this case as the prescriber of Abortifacients who cannot provide its services in Idaho. *McCormack v. Hiedeman,* 900 F. Supp.  2d 1128, 1140-1142 (D. Idaho 2013), aff'd sub nom, *McCormack v. Herzog*, 788 F.3d 1017 (9th Cir. 2015) ("*McCormack*").  TST has standing because it diverted resources in response to the Idaho Abortion Bans to accomplish its mission of ensuring its Idaho members can engage in the Satanic Abortion Ritual in a safe and legal manner.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982) ("*Havens*").  And TST has representational standing for TST members in Idaho who 1) become criminals pursuant to Idaho Code § 18-606(2) if they engage in the Satanic Abortion Ritual; and 2) suffer stigmatic injury for believing a zygote is part of their bodies that can be removed at will.  *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977) ("*Hunt*").

## A.  TST Has Standing as a Prescriber of Abortifacients.

TST is a lawful prescriber of Abortifacients and has standing to challenge the validity of the Idaho Abortion Bans that criminalize the delivery of Abortifacients into Idaho. *Wedges/Ledges of California, Inc. v. City of Phoenix*, 24 F.3d 56, 61 (9th Cir. 1994) (Manufacturer of banned arcade games has standing due to lost business opportunities.) See also *Carey v. Population Services International*, 431 U.S. 678, 684 (1977) and *Eisenstadt*, 405 U.S. at 455 (Distributors of contraceptives have standing to challenge bans on contraceptives).

TST members use Abortifacients as part of the Satanic Abortion Ritual.  This religious use of Abortifacients gives TST standing to challenge the Idaho Abortion Bans that criminalize

their use. *Peyote Way Church of God, Inc. v. Smith*, 742 F.2d 193, 199 (5th Cir. 1984) ("The Church has a personal stake in the constitutionality of the Texas statute [banning peyote] because enforcement of that statute will directly affect the freedom with which its members may fulfill their professed religious commitment.").

Qualified medical professionals who state a clear intention to perform abortions for their patients allege "a sufficiently concrete and imminent injury—possible prosecution and imprisonment" to challenge statutes that regulate abortion providers. *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 916-17 (9th Cir. 2004). The failure to actually provide a medical abortion to avoid the criminal penalties imposed by the Idaho Abortion Bans concretely affects TST's liberty and pecuniary interests, even if TST does not express a specific intent to violate the statute. *Id.* at 917. "The physician is the one against whom these criminal statutes directly operate in the event he procures an abortion that does not meet the statutory exceptions and conditions. The physician-appellants, therefore, assert a sufficiently direct threat of personal detriment" *Doe v. Bolton*, 410 at 188. Nothing in *Dobbs* even remotely suggests medical professionals subject to criminal prosecution for providing abortions have lost their standing to challenge those laws.

TST does not need to show that it currently complies with the Idaho statutes regulating legal abortions. The TST Clinic employs licensed medical professionals who can, in their medical judgment, safely prescribe Abortifacients in accordance with FDA regulations to TST members for inducing abortions at home. Those medical professionals could become licensed to prescribe Abortifacients in accordance with FDA regulations to TST members in Idaho for less than $300. The TST Clinic does not prescribe Abortifacients to TST members in Idaho due to the threat of criminal prosecution and jeopardy to the professional licenses of its staff. Helian

Declaration at ¶¶23 to 26.  This is sufficient to establish standing to challenge the Idaho Abortion Bans.  *McCormack,* 900 F. Supp. 2d at 1142-1143 ("Given that [the physician] faces the threat of prosecution for performing medical abortions, it makes little sense to suggest that [he] must first comply with those laws before he has standing to challenge them.").

The TST Clinic has provided numerous abortions to TST members in its short history.  Helian Declaration at ¶21.  There are dozens of TST members in Idaho who currently are or going to be Involuntarily Pregnant Women.  Dr. J. D. Declaration at ¶12.  It is highly likely that one or more of them would use the unique services of the TST Clinic but for the Idaho Abortion Bans.  Helian Declaration at ¶22.  TST's "theory of standing thus does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties." *Dep't of Commerce v. N.Y.*, 588 U.S. ___, 139 S. Ct. 2551, 2566 (2019).

**B.  TST Has Standing Because It Diverted Resources to Respond to the Idaho Abortion Bans.**

TST has standing because the Idaho Abortion Bans frustrate TST's mission in Idaho and TST has, in response, had to divert its resources to achieve its mission.  *E. Bay Sanctuary Covenant v. Barr,* 964 F.3d 832, 844 (9th Cir. 2020) ("*Barr*"); *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002); *Hayden Lake Recreational Water & Sewer Dist. v. Haydenview Cottage, LLC*, 835 F. Supp.  2d 965, 972-73 (D. Idaho 2011).  There is nothing in the authorities recognizing standing based on a diversion of resources that requires the money to be spent in the state where the challenged conduct occurs.

Prior to *Dobbs*, TST could rely on the availability of legal abortion in Idaho and other states and thus devote its resources to identifying and servicing members who wanted to engage in the Satanic Abortion Ritual.   The Idaho Abortion Bans have made this impossible in Idaho by

11

criminalizing the Satanic Abortion Ritual.  The TST Clinic was created in response to *Dobbs* and state laws banning abortion, including the Idaho Abortion Bans, as a means of continuing its mission.  TST has spent a substantial amount of money to open and maintain the TST Clinic. The TST Clinic currently operates in New Mexico and would readily expand its services into Idaho if it could lawfully do so. Helian Declaration at ¶¶18 to 20 and 27.

### C.  TST Has Standing to Represent Its Members.

TST has standing to bring this suit on behalf of its members because 1) its members would otherwise have standing to sue in their own right; 2) the interests TST seeks to protect are germane to its purpose; and 3) neither the claims asserted, nor the relief requested requires the participation of individual members in the lawsuit.  *Hunt,* 432 U.S. at 343.[6]  Defendants argue TST does not have representational standing because TST members could have been anonymous parties to this case.  Defendants' Memo at p. 5.  This argument has no merit.

### 1.  TST Members Have Standing to Sue in Their Own Right.

TST members in Idaho collectively have standing because they are either 1) Involuntarily Pregnant Women or 2) have suffered stigmatic injury because the Idaho Abortion Bans criminalize conduct based on the TST Tenets.

Individual women who are not pregnant do not have standing to challenge abortion laws because all of the factors that lead to pregnancy "may not take place and all may not combine." *Roe*, 410 U.S. at 128.  But TST represents one thousand seven hundred fifty (1,750) women of

---

[6] TST has standing to assert the rights of its members pursuant to *Hunt* because it "is the functional equivalent of a voluntary membership organization" *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1111 (9th Cir. 2003).  TST "is sufficiently identified with and subject to the influence of those it seeks to represent as to have a personal stake in the outcome of the controversy." *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1096 (9th Cir. 2021). [internal quotations omitted].  Helian Declaration at ¶¶7 and 8.

child-bearing age in Idaho.  Over the course of a year, over two dozen of them become

Involuntarily Pregnant Women.  Dr. J. D. Declaration at ¶12.   These women, collectively

represented by TST, have standing because they are subject to criminal penalties if they engage

in the Satanic Abortion Ritual.

The Idaho Abortion Bans cause all TST members in Idaho to suffer the stigma of being

evil people for believing and acting on TST Tenet III – one's own body is inviolable and subject

to one's own will alone.  Intangible injuries, such as stigmatic injury, can be sufficiently concrete

and particularized to constitute "injury in fact" for purposes of Article III standing.  *Spokeo, Inc.

v. Robins*, 538 U.S. 330, 136 S.Ct. 1540, 1545 (2016).  Stigmatic injury is inflicted when state

action communicates to the affected citizen that his or her religious beliefs are explicitly

disfavored by the state.  *Bostic v. Schaefer*, 760 F.3d 352, 372 (4th Cir. 2014) (Stigmatic injury

caused by state law prohibiting same-sex marriage.); *Catholic League v. City of San Francisco*,

624 F.3d 1043, 1048 (9th Cir. 2010) ("[A]dherents to a religion have standing to challenge an

official condemnation by their government of their religious views.").

Members of TST hold the religious belief their bodies are inviolable and subject to their

will alone.  As a corollary, they believe the organism defined by the State of Idaho as an "unborn

child" is not a separate and distinct human being but rather a part of the woman's body that can

be removed on demand and without guilt at any time and for any reason prior to viability.

Members of TST do not believe a human being comes into existence until the fetus is viable, i.e.,

independently capable of life outside the womb.  These beliefs are held by both men and women

and without regard to whether one is pregnant.  Helian Declaration at ¶¶12 to 15.

The Idaho Abortion Bans explicitly state the religious belief held by some Christians that

a human being comes into existence at conception.  The Idaho Abortion Bans conscript the use

of a woman's uterus to incubate a Prenatal Person without her consent or any compensation.

These concepts are deeply offensive to members of TST and communicate – unequivocally –

that their religious beliefs are unacceptable in the State of Idaho.[7]   TST members go to jail if

they engage or assist in the Satanic Abortion Ritual.  This stigmatic injury gives each TST

member in Idaho standing to challenge the validity of the Idaho Abortion Bans.

> **2.      TST Does Not Have to Reveal the Identity of Its Members.**

Defendants argue TST must "identify" its members, at least as Jane Does.  See

Defendants' Memo at p. 5.  They cite no authority to support this argument because there is

none.

TST needs to plead and prove at least one member has suffered the requisite harm.

*Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).  However, no authority requires that

identity be made by name - anonymously or otherwise.  As the Court said in *Nat'l Council of La

Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015):

> Where it is relatively clear, rather than merely speculative, that one or more
> members have been or will be adversely affected by a defendant's action, and
> where the defendant need not know the identity of a particular member to
> understand and respond to an organization's claim of injury, we see no purpose to
> be served by requiring an organization to identify by name the member or
> members injured.

The Dr. J.D. Declaration at ¶12 and Helian Declaration at ¶¶9 and 12 to 15 provide the

requisite proof that members of TST are and will be harmed by the Idaho Abortion Bans.[8]  Dr.

J.D. opines there are dozens of TST members in Idaho who meet the definition of Involuntarily

---

[7] The Defendants show their contempt for TST's religious beliefs with their depiction of the
Satanic Abortion Ritual as the cold-blooded murder of an "unborn child", denouncing TST's
"enthusiasm for abortion," and the exhortation for the Court to "flout and jeer" TST as if this
case was a "fiddle duel" in a Charlie Daniel's song.  See Defendants' Memo at pp.1-3.

[8] *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989) (Plaintiff opposing Rule 12(b)(1)
motion may rely on affidavits.).

Pregnant Women and are or will be injured by the Idaho Abortion Bans.  Ms. Helian states the

approximately 3,500 TST members in Idaho will suffer stigmatic injury because the State of

Idaho has criminalized their belief that their bodies are inviolable and subject to their will alone.

These facts show it is "relatively clear" and "not speculative" that TST members are actually

suffering injury as a result of Idaho Abortion Bans.

> **3.      The Interests TST Seeks to Protect Are Germane to Its Purpose.**

The second prong of *Hunt* is satisfied by showing that TST's purpose bears some

reasonable and rational relationship to the Idaho Abortion Bans.  *Central Delta Water Agency v.

U.S.*, 306 F.3d 938, 951 (9th Cir. 2002).  The purpose of TST is to promote the TST Tenets and

the Satanic Abortion Ritual.  TST has financed several lawsuits in other states challenging

abortion regulations that infringe upon TST beliefs and practices.  Helian Declaration at ¶6.

The Idaho Abortion Bans are patently antithetical to TST's purposes because they

criminalize the Satanic Abortion Ritual and thus suppress the exercise of the TST Tenets by TST

members.  Eliminating the Idaho Abortion Bans is not just germane to TST's purpose, it is

essential.

> **IV.     The Idaho Abortion Bans Cause the Unconstitutional Taking
> of a Woman's Property Right to Exclude a Prenatal Person from Her Uterus.**

> **A.  The Use and Occupancy of a Uterus is a Property Interest.**

The advent of IVF and gestational surrogacy demonstrate the inarguable fact that the use

of a woman's uterus to incubate and deliver a Prenatal Person has tangible, economic value.

Bridget J. Crawford, Taxation, Pregnancy, and Privacy, 16 Wm. & Mary J. Women & L. 327

(2010), https://scholarship.law.wm.edu/wmjowl/vol16/iss2/4, last visited December 27, 2022.

("A surrogate receives money for carrying and bearing a child.  This payment is income by any

definition, even if the surrogacy contract recites that it is a 'reimbursement.'").  See *United

*States v. Garber*, 607 F.2d 92, 97 (5th Cir. 1979) ("[B]lood plasma, like a chicken's eggs, a sheep's wool, or like any salable part of the human body, is tangible property which in this case commanded a selling price dependent on its value.").

Gestational surrogacy shows the uterus is "property" in every sense of the word. The Idaho Abortion Bans commandeer the uterus but provide nothing in return – other than jail if the mother tries to reclaim it by abortion.

Property interests are not created by the Constitution. Rather, they are created, and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law. *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980). Under common law, individuals have a property interest in the use of their own bodies. In *Union Pacific Railway Co. v. Botsford*, 141 U.S. 250, 251 to 252 (1891), the U.S. Supreme Court said:

> No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law. . . .To compel any one, and especially a woman, to lay bare the body, or to submit it to the touch of a stranger, without lawful authority, is an indignity, an assault and a trespass.

The common law in Idaho is based on the principles of natural law. *Marty v. State*, 117 Idaho 133, 143 (1990). As explained by John Locke in Two Treatises of Government, Bk. II, § 87 (Gryphon special ed. 1994) (1698) and the Montana Supreme Court in *Armstrong v. State*, 296 Mont. 361, 371-72 (1999), natural law means:

> [T]he laws of nature require that each individual has an inherent property interest in his own person and has the capacity for and the right of rational self-determination which must be promoted and protected by civil society and political institutions.

16

An Idaho woman can dispose of her uterus by hysterectomy[9] or anatomical gift. Idaho Code § 39-3404. "The right of a property owner to dispose of his or her property on terms that he or she chooses has come to be recognized as a separate stick in the bundle of rights called property." *Nelsen v. Nelsen*, 508 P.3d 301, 332 (Idaho 2022).

An Idaho woman can lease out the use of her uterus to a third party as a gestational surrogate. "The right to transfer is one of the most essential sticks in the bundle of rights that are commonly characterized as property." [internal quotations and citations omitted]. *Shackleford v. U.S.,* 262 F.3d 1028, 1032 (9th Cir. 2001).

**B.  The Costs of the Idaho Abortion Bans Should Be Borne by the State.**

The cost of compelling an Involuntarily Pregnant Woman to carry a Prenatal Person is paid for <u>solely</u> by the Involuntarily Pregnant Woman.  As the U.S. Supreme Court said in *San Diego Gas Electric Co. v. San Diego*, 450 U.S. 621, 656 (1981) ("*San Diego Gas*"):

> When one person is asked to assume more than a fair share of the public burden, the payment of just compensation operates to redistribute that economic cost from the individual to the public at large.

See also, *Lingle v. Chevron U. S. A.*, 544 U.S. 528, 537 (2005) ("*Lingle*").

Gestational surrogacy establishes the economic value for the use of a woman's uterus to incubate and birth a Prenatal Person.  *Otay Mesa Prop., L.P. v. United States*, 670 F.3d 1358, 1363-64 (Fed. Cir. 2012) ("Once a taking has been classified as either temporary or permanent, the court applies the appropriate method of determining just compensation.  The usual measure of just compensation for a temporary taking is the fair rental value of the property for the period of the taking." Citing *Kimball Laundry Co. v. U.S.*, 338 U.S. 1, 7 (1949)).  The fair market rental

---

[9] By the age of 60, more than one-third of all women have had a hysterectomy. https://nwhn.org/hysterectomy/, last visited April 26, 2023.

value for the occupancy of a woman's uterus to voluntarily incubate and birth a Prenatal Person runs into the tens of thousands of dollars.  If the people of the State of Idaho want a Prenatal Person created without the consent of the mother to be carried to term, then they should pay the Involuntarily Pregnant Woman the going rate for the use of her uterus.

The Fifth Amendment does not bar the State of Idaho from making the value judgment to protect all Prenatal Persons, even those created by accident, by enacting the Idaho Abortion Bans.  The Fifth Amendment does, however, require the State of Idaho to pay for the property it takes to achieve that end.  *First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles*, 482 U. S. 304, 315 (1987).  (The Fifth Amendment "is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." [emphasis in original]).

## C.  The Right to Exclude a Prenatal Person from the Uterus is a Property Interest.

The legal and practical effect of the Idaho Abortion Bans is that a Prenatal Person physically occupies the uterus of an Involuntarily Pregnant Woman against her will and in complete derogation of her property right to exclude that Prenatal Person.  As the U.S. Supreme Court said in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) ("*Loretto*"):

> Property rights in a physical thing have been described as the rights to possess, use and dispose of it.  To the extent that the government permanently occupies physical property, it effectively destroys each of these rights.  First, the owner has no right to possess the occupied space himself, and also has no power to exclude the occupier from possession and use of the space.  The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights.  [internal citations and quotations omitted]

The fact that the space occupied by a Prenatal Person is measured in microns is irrelevant.  See, *Loretto*, 458 U.S. at 436 ("[C]onstitutional protection for the rights of private

18

property cannot be made to depend on the size of the area permanently occupied.").  The fact that the space occupied by a Prenatal Person is a woman's uterus is likewise irrelevant.  *Horne v. Dept. of Agriculture* , 576 U.S. 350, 358 (2015) ("[P]ersonal property [is not] any less protected against physical appropriation than real property").

### D.  The Idaho Abortion Bans Take a Woman's Property Right To Exclude a Prenatal Person From Her Uterus.

There are two kinds of regulatory actions generally deemed to be a *per se* taking for Fifth Amendment purposes.  *Lingle,* 544 U.S. at 538.  The first is government action that requires the owner of the *res* to suffer a physical invasion, however minor.  *Loretto*.  The invasion can be temporary.  *Cedar Point Nursery v. Hassid*, 594 U.S. __, 141 S. Ct. 2063, 2074 (2021) ("*Cedar Point Nursery*") ("[A] physical appropriation is a taking whether it is permanent or temporary.").

The Idaho Abortion Bans terminate the right of a woman to exclude a Prenatal Person from her uterus by making its removal a crime.  It criminalizes a medical professional's access to the woman's uterus – voluntarily given by the woman – to remove a Protected Person.  A Prenatal Person is a "person" in its own right in the State of Idaho – "a precious and unique life, one that is independent and distinct from the mother."  Idaho Code § 18-8802(8).  By operation of law, that Prenatal Person continues to occupy a uterus without the woman's consent until it is born.  That is the very essence of a *per se* taking by occupancy under *Loretto* and *Cedar Point Nursery.*  See also, *Moore v. East Cleveland*, 431 U.S. 494, 520 (1977) (Stevens, J., concurring (Taking occurs when the state terminates the "fundamental right normally associated with the ownership of residential property — that of an owner to decide who may reside on his or her property").

The other kind of *per se* taking occurs when the state imposes such onerous regulations on a property owner that there is no economic use for the *res*. *Lingle*, 544 U.S. at 537

("[G]overnment regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster — and that such 'regulatory takings' may be compensable under the Fifth Amendment").

A "regulatory taking" occurs when the state's regulation completely deprives an owner of "*all* economically beneficial us[e]" of her tangible property." [emphasis in the original] *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992).  Under the Idaho Abortion Bans, a woman is stripped of the only economically beneficial use she can make of her uterus – to rent it out as a gestational carrier.  She cannot be a gestational carrier if she is already pregnant.

The total deprivation of this sole economic use of a uterus is a *per se* taking, just as much as the physical occupation of the uterus by a Protected Person.  The woman's property right to transfer the use of her uterus to a third party as a gestational surrogate is terminated.  It does not matter that the economic loss is for nine months.  Regulatory takings can be temporary.  *San Diego Gas,* 450 U.S. at 657 ("This Court more than once has recognized that temporary reversible 'takings' should be analyzed according to the same constitutional framework applied to permanent irreversible 'takings.'").

### E.  An Injunction is an Appropriate Remedy for Count One.

Citing *Knick v. Twp.  Of Scott, Pa*., 139 S. Ct. 2162 (2019) ("*Knick*") and *KMST, LLC v. Cnty.  Of Ada,* 138 Idaho 577 (2003), Defendants argue TST "can't seek an equitable remedy on its takings claim in federal court."  Defendants' Memo at pp. 10-11.  This argument confuses the distinction between the existence of a viable takings claim and the appropriate remedy once a taking has been established.  *Pete v. United States*, 569 F.2d 565, 568 (Fed. Cir. 1978) ("[A]n inverse condemnation proceeding is a two-step process.  The plaintiff must first institute an action and establish the fact of a taking.  Only if successful on this first step can the plaintiff

advance to the quantum stage to determine the value of the property for purposes of compensation.").

In deciding the Motion, the Court must determine whether Count One states a takings claim as a matter of law.  The Court has the jurisdiction and duty to make that threshold determination without regard to the available remedies.  *Knick*, 139 S.Ct. at 2179 ("A property owner may bring a takings claim under § 1983 upon the taking of his property without just compensation by a local government.").

Under Idaho law, the remedies for the improper taking of personal property by government overreach can be either damages determined by way of inverse condemnation or an injunction.  *Johnson v. Boise City*, 87 Idaho 44, 52 (1964) ("*Johnson*") ("In the instances where exercise of the authority transgresses the bounds of reasonableness, or is arbitrary in result, to the point where there is an actual taking of private property for public use, (Idaho Const. Art. 1, § 14) . . . an action would lie for damages by way of inverse condemnation or for injunctive relief.").  See also *Carson Harbor Village Ltd. v. City of Carson*, 37 F.3d 468, 473 n.4 (9th Cir. 1994) ("*Carson Harbor*") ("When the effects of a regulation do not substantially advance a legitimate state interest, compensation is not automatically due.  Rather, the proper remedy for an invalid exercise of the police power Is amendment or withdrawal of the regulation and, if authorized and appropriate, damages." [internal quotations omitted]).

The allegations of the Complaint, which the Court must accept as true, show the Idaho Abortion Bans are arbitrary and transgress the bounds of reasonableness.  Injunctive relief is therefore available and appropriate under *Johnson* and *Carson Harbor.*

V.     **The Idaho Abortion Bans Force Involuntarily Pregnant Women into Involuntary Servitude.**

In the antebellum South, slave women were chattel whose bodies were used to produce new slaves.  If the baby was a girl, she too would eventually be compelled to produce more new slaves.  *See e.g. Maria v. Surbaugh*, 23 Va. 228, 237, 1824 WL 1192, at *5 (Va. 1824) ("It was enacted, that all children born in this country shall be held bond or free, according to the condition of the mother.")

The Idaho Abortion Bans have, by criminalizing medically safe abortions, forced Involuntarily Pregnant Women into the state of involuntary servitude inflicted on antebellum slave women.  They are forced – without their consent – to incubate a zygote into a viable baby.  Their bodies are used as factories to provide all of the labor, hormones, nutrients, oxygen, and safety necessary to complete a pregnancy.  Their daughters will likewise be forced to incubate and produce babies without their consent.  That is involuntary servitude, prohibited by the Thirteenth Amendment.[10] It is particularly egregious because 21st Century women have the technological means at their disposal to safely terminate unwanted pregnancies.

There is no dispute that being pregnant and delivering a baby requires an extraordinary amount of work.  The experience of gestational surrogates shows that incubating a zygote into a viable baby and giving it birth is a richly compensated service in a free market economy.

The Idaho Abortion Bans compel an Involuntarily Pregnant Woman – without compensation and under threat of incarceration – to provide the same services and labor for the benefit of a Prenatal Person as a paid gestational surrogate.  The Idaho Abortion Bans are the very essence of involuntary servitude outlawed by the Thirteenth Amendment.  *United States v.*

---

[10] The Thirteenth Amendment is self-executing.  *Bailey v. Alabama*, 219 U.S. 219, 241 (1911) ("*Bailey*").

*Kozminski*, 487 U.S. 931, 952 (1988) ("'[I]nvoluntary servitude' necessarily means a condition

of servitude in which the victim is forced" to work for the defendant by the use or threat of

physical restaint or physical injury, or by the use or threat of coercion through law or the legal

process."). See *Bailey*, 219 U.S. at 241 ("The plain intention was to abolish slavery of whatever

name and form and all its badges and incidents; to render impossible any state of bondage; to

make labor free, by prohibiting that control by which the personal service of one man is disposed

of or coerced for another's benefit which is the essence of involuntary servitude.").

### VI.     Count Three States a Claim for Violation of the Equal Protection Clause.

"Classifications that impinge on a fundamental right are subject to strict scrutiny when

challenged as a violation of equal protection." *Witt v. Air Force*, 527 F.3d 806, 825 (9th Cir.

2008) (Canby, J. concurring), citing *Dunn v. Blumstein*, 405 U.S. 330, 337-39 (1972).

"Moreover, quite apart from the Equal Protection Clause, a state law that impinges upon a

substantive right or liberty created or conferred by the Constitution is, of course, presumptively

invalid, whether or not the law's purpose or effect is to create any classifications." *San Antonio*

*School District v. Rodriguez*, 411 U.S. 1, 61 (1973) (Stewart, J. concurring).  See also *Plyler v.*

*Doe*, 457 U.S. 202, 232 (1982) (Harlan, J. concurring) ("Classifications infringing substantive

constitutional rights necessarily will be invalid, if not by force of the Equal Protection Clause,

then through operation of other provisions of the Constitution.").

Rape victims are exempt from the Idaho Abortion Bans but Involuntarily Pregnant

Women are not.  The only difference between the two groups of women is that Involuntarily

Women consented to sex while rape victims did not.[11]  The Idaho Abortion Bans thus impose the

---

[11] Defendants argue, without citing any authority, that "no fundamental right is at issue" even
though the Complaint explicitly alleges the fundamental right to engage in Protected Sex at ¶96.
Defendants' Defendants' Memo at p. 15

obligation on Involuntarily Pregnant Women to carry an unwanted Prenatal Person to term – an obligation rape victims do not share.  This places a burden on Involuntarily Pregnant Women *solely* because they consented to sex while the rape victim did not.  The application of the Idaho Abortion Bans to an Involuntarily Pregnant Woman is therefore analyzed under the strict scrutiny standard because it burdens the exercise of a fundamental right.[12]

Citing *Dobbs*, Defendants argue Count Three fails to state a claim because "[a]t bottom, this is just another attempt to recognize a constitutional right to abortion [and] the States are free to regulate it as they see fit." Defendants' Memo at pp. 12-13.  But *Dobbs* explicitly said the fundamental right to engage in Protected Sex guaranteed by *Lawrence* and *Griswold* was not affected because its exercise "does not destroy potential life." *Dobbs*, 142 S.Ct. at 2261.

TST does not take issue with the power of the state to protect potential life or the victims of crime.  However, TST does take issue with the exercise of that power in a manner that burdens the fundamental right of Involuntarily Pregnant Women to engage in Protected Sex.

If the only purpose of the Idaho Abortion Bans was to protect Prenatal Persons, they would apply to all women regardless of how or why they got pregnant.  Instead, an exemption was created for rape victims.  The Equal Protection Clause requires the Defendants to explain what compelling state interest is served by that exemption in a narrowly tailored manner. *Seeboth v. Allenby*, 789 F.3d 1099, 1104 (9th Cir. 2015) ("If the classification . . . burdens the exercise of a fundamental right, we apply strict scrutiny and ask whether the statute is narrowly tailored to serve a compelling governmental interest").

_____

[12] Defendants' reliance on *Gallinger v. Becerra*, 898 F.3d 1012 (9th Cir. 2018) and *Barren v. Harrington*, 152 F.3d 1193 (9th Cir. 1998) in support of their equal protection argument is misplaced.  Defendants' Memo at p. 13.  In neither case was a burden imposed on the exercise of anyone's fundamental rights.

Defendants argue the rape exception protects "the welfare of rape victims along with the life of the unborn."  Defendants' Memo at p. 14.  But they do not explain why an exemption from the Idaho Abortion Bans based *solely* on whether a woman consented to have sex is narrowly tailored to serve that purpose.  *Carroll v. Princess Anne*, 393 U.S. 175, 184 (1968) ("[T]he order must be tailored as precisely as possible to the exact needs of the case.").  Idaho could readily achieve the same objective by imposing a mandatory life sentence on a rapist who gets his victim pregnant – a solution that does not affect the exercise of the fundamental right to engage in Protected Sex.

**VII.    Conclusion.**

*Dobbs* reframed the national debate on abortion.  One of the issues that must be addressed and resolved post-*Dobbs* is who pays the costs for a ban on abortion when a woman becomes pregnant by accident.  The solution posited by the State of Idaho is the woman pays that cost alone because a Prenatal Person is a precious and unique life whose needs take total and absolute precedence over everyone else. That solution strips an Involuntarily Pregnant Woman of compensation for the use of her uterus in violation of the Takings Clause of the Fifth Amendment and coerces her services and labor to incubate and deliver a Prenatal Person in violation of the ban on involuntary servitude in the Thirteenth Amendment.  Our Constitutional form of government requires the Court to protect these rights, even in the face of legislative edicts that embrace Evangelical Christian theology on when a human being comes into existence.

For the reasons set forth above, TST respectfully requests the Motion be denied.

May  4, 2023

*Jeremiah M. Hudson*
Jeremiah M. Hudson
Fisher Hudson Shallat
950 W. Bannock St.

25

Suite 630,
Boise, ID 83702
jeremiah@fisherhudson.com
208-345-7000
*Attorney for Plaintiff The Satanic Temple*

<u>*W. James Mac Naughton*</u>
W. James Mac Naughton, Esq.
7 Fredon Marksboro Road
Newton, NJ 07860
wjm@wjmesq.com
732-213-8180
*Attorney for Plaintiff The Satanic Temple*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the date of this pleading, I electronically filed it with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

BRIAN V. CHURCH
Deputy Attorney General
brian.church@ag.idaho.gov

DAYTON P. REED
Deputy Attorney General
dayton.reed@ag.idaho.gov

*/s/ W. James Mac Naughton*