UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THE SATANIC TEMPLE,<br><br>        Plaintiff,<br><br>v.<br><br>RAUL LABRADOR, in his capacity as the Attorney General of Idaho; JAN M. BENNETTS, in her capacity as Ada County Prosecutor; and THE STATE OF IDAHO,<br><br>        Defendants. | Case No. 1:22-cv-00411-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Before the Court is Defendants Raul Labrador, Jan Bennetts, and the State of Idaho's Motion to Dismiss. Dkt. 23. The Court held oral argument on December 6, 2023, and took the matter under advisement. Upon review, and for the reasons set forth below, the Court GRANTS the Motion and DISMISSES this case.

## II. OVERVIEW and BACKGROUND

In the summer of 2022, the United States Supreme Court overruled its prior holdings in *Roe v. Wade* and *Casey v. Planned Parenthood* that the Constitution guarantees a right to abortion. *Dobbs v. Jackson Women's Health*, 142 S. Ct. 2228, 2243 (2022). Decisions regarding those weighty matters were "return[ed] . . . to the people's elected representatives." *Id*.

Shortly after the *Dobbs* decision, the State of Idaho enacted various statutes outlawing (and criminalizing) abortion. At issue today are Idaho Code § 18-604 et seq. (the "Criminal Abortion Statute") and the criminal and civil sanctions imposed by Idaho Code § 18-8801 et seq. (the "Fetal Heartbeat Statute") on abortion providers.

After the enactment of these statutes, The Satanic Temple ("TST") filed the instant case arguing Defendants actions have: (1) effected a regulatory taking of the economic value of a pregnant woman's womb in violation of the Fifth Amendment; (2) effectively made pregnant women into slaves in violation of the Thirteenth Amendment; (3) given unconstitutional preferences to rape victims in violation of the Fourteenth Amendment; and (4) violated Idaho's religious freedom statutes.[1] *See generally* Dkt. 15.

On March 14, 2023, Defendants filed a Motion to Dismiss. Dkt. 23. Therein, they allege: (1) certain Defendants are immune from suit; (2) TST does not have standing; and (3) even if it did have standing, it has not pleaded cognizable legal claims. *Id*. at 10. TST opposed the motion. Dkt. 30.

After briefing on the Motion was complete, TST filed a Motion for Leave to File a Sur-Reply arguing Defendants had raised certain arguments for the first time in their reply brief. Dkt. 36. Defendants did not agree with TST's characterization of its briefs, but nonetheless, did not oppose the request. Dkt. 38. Accordingly, the Court granted the same

---

[1] While some of TST's arguments are interesting and unique in the legal sense—such as whether a woman's uterus has economic value and deserves compensation—some of its arguments border on the offensive—such as comparing women who are "forced" to carry a child to African American slave women in the antebellum south. Defendants shared similar observations at oral argument much to the dismay of TST. Regardless of any stigma that may be associated with TST itself, its beliefs, or its arguments, the Court evaluates the claims at issue solely on the merits.

and allowed TST an opportunity to file a short sur-reply. Dkt. 40.

On December 4, 2023, Defendants filed a Notice of Supplemental Authority. Dkt. 45. Herein, Defendants brought to the Court's attention a decision from the United States District Court for the Southern District of Indiana, *Satanic Temple, Inc. v. Rokita*, that addressed many of the issues presently before the Court. The cited decision was issued on October 25, 2023. The Court had already located this decision (as it arose after briefing on the current motion but before the hearing), but appreciates Counsel's diligence in bringing it up nonetheless.

Similarly, on December 4, 2023, TST filed a Notice of Supplemental Authority. Dkt. 46. Here, TST directs the Court to various decisions from the *GenBioPro, Inc. v. Sorsaia* case out of the Southern District of West Virginia. 2023 WL 5490179 (S.D.W. Va. Aug. 24, 2023). In particular, it highlights an August 24, 2023, decision from that court dealing with the legal principle of preemption, the FDA's regulatory scheme regarding mifepristone, and whether nurses can prescribe that particular drug via telemedical consultations. *Id.* The Court will address that case in more detail below, but finds it unhelpful to the current posture of this case. Again, however, it appreciates Counsel's diligence in keeping the Court apprised of changes in this ever-changing area of law.

As noted, oral argument was held on December 6, 2023, and the matter is now ripe for review.

### III. LEGAL STANDARD

A motion to dismiss based upon a defendant's Eleventh Amendment sovereign immunity may be brought under either Federal Rule of Civil Procedure 12(b)(1) or

12(b)(6). *See Sato v. Orange Cnty. Dep't of Educ.*, 861 F.3d 923, 927 n.2 (9th Cir. 2017). A motion to dismiss based upon a plaintiff's lack of Article III standing is properly brought under Rule 12(b)(1). *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011). And a motion to dismiss based on the "absence of sufficient facts alleged under a cognizable legal theory" is properly brought under Rule 12(b)(6). *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019).

### A. Rule 12(b)(1)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the Court's subject matter jurisdiction. A lack of jurisdiction is presumed unless the party asserting jurisdiction establishes that it exists. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Thus, the plaintiff bears the burden of proof on a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. *Sopcak v. Northern Mountain Helicopter Serv.*, 52 F.3d 817, 818 (9th Cir. 1995). If the court determines that it does not have subject matter jurisdiction, it must dismiss the claim. Fed. R. Civ. P. 12(h)(3).

### B. Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a claim if the plaintiff has "fail[ed] to state a claim upon which relief can be granted." "A Rule 12(b)(6) dismissal may be based on either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (cleaned up). Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing

that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007). "This is not an onerous burden." *Johnson*, 534 F.3d at 1121.

A complaint "does not need detailed factual allegations," but it must set forth "more than labels and conclusions, and a formulaic recitation of the elements." *Twombly*, 550 U.S. at 555. The complaint must also contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Id.* at 570.

In deciding whether to grant a motion to dismiss, the court must accept as true all well-pleaded factual allegations made in the pleading under attack. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). A court is not, however, "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

In cases decided after *Iqbal* and *Twombly*, the Ninth Circuit has continued to adhere to the rule that dismissal of a complaint without leave to amend is inappropriate unless it is beyond doubt that the complaint could not be saved by an amendment. *See Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009).

## IV. ANALYSIS

Defendants assert this case is "about abortion, from start to finish." Dkt. 23-1, at 24. TST, on the other hand, asserts this case addresses "what rights, if any, [] a woman [has] when her body is conscripted by the state of Idaho *without her consent* to incubate and give birth to a prenatal person." Dkt. 30, at 8 (emphasis in original). The Court wishes to address

this issue at the outset as the way in which this case is "framed" makes a difference in the outcome.

Throughout its briefing and at oral argument, TST argued Defendants have "eviscerate[d] a woman's fundamental right to engage in protected sex," *id*. at 12, and/or otherwise "burden[ed] the exercise of a fundamental right [to engage in protected sex]." *Id*. at 30. But Defendants do no such thing. The statutes at issue do not discuss the right to engage in private sexual activities in any way. The regulations are directed at pregnancy and abortion. Now, it goes without saying that pregnancy—and, therefore, abortion—are not possible without some initial sexual activity,[2] but the fact remains that Defendants' actions are not directed at the act of sex or any restrictions thereon. The regulations do not burden that right in any way. TST's arguments on this wise miss the mark. The challenged regulations here deal with abortion. As already noted, there is no longer a federally recognized constitutional right to abortion. There is no right to abortion in the state of Idaho either. The lack of an option for abortion is what gives rise to TST's causes of action; not anything having to do with the act of sex.

A deeper review of the facts of this case illustrates why TST's arguments are misplaced, even by its own admissions.

After the *Dobbs* decision, TST formed an abortion clinic called "Samuel Alito's Mom's Satanic Abortion Clinic" ("the Clinic")[3] to combat state laws banning abortion,

---

[2] Unless pregnancy was the result of in virto fertilization. But more on that later.

[3] Defendants take issue with the fact that the Clinic is owned and operated by "The Satanic Temple, Inc." and the Plaintiff in this case is "The Satanic Temple." Dkt. 23-1, at 17. In response, TST explains that it was incorporated as a Massachusetts religious organization in 2017 using the name "The Satanic Temple," but changed its name to "The Satanic Temple, Inc." in 2019. Dkt. 30, at 7n.1. It requests leave to amend its

including those in Idaho. The Clinic supports TST's effort to create a wider health network: *TST Health*. The Clinic is "located" in New Mexico. It does not appear there are any brick-and-mortar locations for TST Health; rather, the Clinic is a telehealth network of licensed medical professionals who prescribe abortifacient drugs to members of TST who wish to induce abortions at home. The Clinic does not currently prescribe abortifacients to any of TST's members in Idaho for fear of prosecution but asserts it would like to expand its services into Idaho if it could "lawfully do so." Dkt. 30, at 18.  TST claims it is harmed by Idaho's law criminalizing abortion.

Members of TST wishing to have an abortion perform the Satanic Abortion Ritual. Dkt. 15-1. This self-described "destruction ritual" mandates, among other things, that the pregnant woman look at her own reflection and recite a personal affirmation as follows: "By my body, my blood; By my will, it is done." *Id.*, at 2, 4. Members of TST assert Idaho's new laws prevent them from engaging in this personal abortion ritual by dictating that women cannot legally end a pregnancy if they so desire.

Thus, to reiterate, both the alleged organizational harm the Clinic has suffered, and the alleged individual harm members of TST suffer relate to abortion, not sexual activity. That is the lens through which the Court views the arguments today.

Defendants raise four primary justifications in support of their Motion to Dismiss. The Court will address each in turn.

---

Amended Complaint to clarify its current and proper name. *Id*. The Court understands Defendants position, but finds such amendment is unnecessary considering its ruling today dismissing the case on other grounds.

### A. Sovereign Immunity

As an initial matter, TST has named "the State of Idaho" as a Defendant in this suit. In their opening brief, Defendants argue the State of Idaho cannot be sued in federal court without its consent and affirm the State of Idaho has not waived its sovereign immunity. This is correct. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 72–73 (1996); *Hans v. Louisiana*, 134 U.S. 1, 13 (1890). TST does not rebuff this argument in any way in briefing. At oral argument, when asked, it acquiesced the point. Accordingly, the State of Idaho is dismissed as a Defendant.

### B. Standing

Article III standing requires a plaintiff to show: (1) "it has suffered an 'injury in fact'"—an invasion of a legally protected interest that is (a) "concrete and particularized" and (b) "actual or imminent, not conjectural or hypothetical"; (2) "the injury is fairly traceable to the challenged action of the defendant"; and (3) the injury will "likely" be "redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 180–81 (2000); Lujan 504 U.S. at 560–61. TST "bears the burden of establishing these requirements at every stage of the litigation." *Krottner v. Starbucks Corp*., 628 F.3d 1139, 1141 (9th Cir. 2010).

In this case, TST does not have standing; either as an association on behalf of its members, or on its own behalf.

#### 1. *Associational Standing*

Associational standing requires that: (1) one or more of an organization's members would have Article III standing to sue in their own right; (2) the interests at stake are

germane to the organization's purpose; and (3) neither the claim asserted, nor the relief requested, requires participation by the individual members in the lawsuit. *Laidlaw*, 528 U.S. at 180–81.

TST has not identified any *specific* Plaintiff who has suffered, or will suffer, the harms it alleges Defendants' actions are causing. Defendants' first argument is that TST must list someone *by name* so they can ascertain whether that person actually meets the standing requirements. Citing *Summers v. Earth Island Inst.*, Defendants assert TST must "identify" its "members who have suffered the requisite harm." 555 U.S. 488, 499 (2009). At a minimum, Defendants assert TST could have identified a person anonymously or via pseudonym if it was worried about notoriety or retribution. TST disagrees. Citing *Nat'l Council of LaRaza v. Cegavske*, TST argues that if it is "relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action . . . we see no purpose to be served by requiring an organization to identify by name the member or members injured." 800 F.3d 1032, 1041 (9th Cir. 2015).

The Court need not decide this issue conclusively[4] because, even under TST's reading of the "identity" requirement, it loses. It is not relatively clear that *anyone* who is a member of TST—identified or anonymous—has suffered, or will suffer, an injury as a

---

[4] Defendants respond further that *LaRaza* is "in tension with *Summers*," Dkt 35, at 4 (citing *California Rest. Ass's v. City of Berkeley*, 65 F.4th 1045, 1063 (9th Cir. 2023) (Baker, J., concurring), *amended and superseded on denial of rehearing en banc* by *California Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1115 (9th Cir. 2024)) and that the Court should not give that case any weight. Again, the Court does not need decide this issue because, even under TST's interpretation, they do not have standing. But for what its worth, the Court subscribes to the idea that individual members must *ordinarily* be named; especially when a party is a relatively large group. *See Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. California Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013) ("The requirement of naming the affected members has never been dispensed with in light of statistical probabilities." (cleaned up)).

result of Defendants' actions. TST has submitted two affidavits in support of its argument that one or more individual members is at risk from Defendant's actions. Both affidavits, however, suffer from defects rendering each unpersuasive.

The first affidavit, from Dr. J.D.[5] asserts he or she has been "advised" that TST has 1,750 women of child-bearing age in Idaho who are members. Dkt. 32, at 2. Based upon a statistical analysis of those women who are child-bearing age, combined with the fertility rate in Idaho, the abortion rate in Idaho, and various other factors, Dr. J.D. speculates "to a reasonable degree of medical probability" that 115 women who are members of TST in Idaho may become pregnant during the year and many of them are pregnant involuntarily and would like to have an abortion. *Id*.

The second affidavit is from Erin Helian,[6] who serves as the executive director of TST. She opines that it is "highly likely that one or more of [TST's] members in Idaho would use the unique services of [the Clinic] but for the Idaho abortion bans." Dkt. 31, at 5.

TST argues these affidavits are sufficient to illustrate it has organizational standing to sue on behalf of its members who have suffered, or will suffer, harm.

As one Court who recently weighed similar arguments raised by TST noted: these "calculated allegations do not inspire confidence." *Satanic Temple, Inc. v. Rokita,* 2023 WL 7016211, at *6 (S.D. Ind. Oct. 25, 2023). And as Defendants in this case point out, one

---

[5] This Doctor elected to use a pseudonym as part of these proceedings.

[6] This is an assumed name used by this individual for "fear of violent retribution from domestic terrorists." Dkt. 31, at 1.

must jump through a variety in hoops in the hopes of finding one or more identifiable plaintiffs that have standing. For example, one must assume—based upon a statistical probability—that a member of TST in Idaho got pregnant unintentionally, that she decided to terminate that pregnancy, and that she decided to do so via the Satanic Abortion Ritual (as opposed to some other way or via some other service). Simply put, there is no way to verify any of the data TST puts forth.[7] Is it *unreasonable* to suggest someone in Idaho meets the criteria? No. But the Court needs more than speculation based upon statistics.[8] As the Supreme Court has held:

> While it is certainly possible—perhaps even likely—that one individual will meet all of these criteria, that speculation does not suffice. Standing, we have said, is not an ingenious academic exercise in the conceivable[,] but requires a factual showing of perceptible harm. In part because of the difficulty of verifying the facts upon which such probabilistic standing depends, the Court has required plaintiffs claiming an organizational standing to identify members who have suffered the requisite harm . . . .

*Summers*, 555 U.S. at 499 (cleaned up). While associational standing is permissible in order to allow "abortion providers to invoke the rights of their actual or potential patients in challenges to abortion-related regulations," TST has wholly failed to meet its burden in

---

[7] In its sur-reply, TST tries to buttress its arguments by affirmatively stating it has 27 members in Idaho who become involuntarily pregnant each year. Dkt. 40, at 2. But again, by its own admission, this number is based upon "fertility and abortion rates maintained by state and federal government agencies applied to the facts . . . ." *Id.* It then goes on to say it is "relatively clear, rather than merely speculative that one or more of these [27 women] have been or will be adversely affected by a Defendant's actions each year." *Id.* at 2–3. This explanation does not assuage the Court's concerns. It is still based upon statistics and probabilities *that may or may not be accurate.* TST has not verified *any* of the data in a real-life setting to determine if any actual women fall into any specific category.

[8] Notably, while Helian states that the Clinic has received "hundreds of inquires . . . about its services," notably absent is any indication that any of those inquires came from members of TST residing in Idaho. Dkt. 31, at 5. It is also worth mentioning that the Clinic became operational *after* this lawsuit was filed. *Id.* (noting the Clinic began services in February 2023).

showing there are actual or potential Idaho members who are affected by Idaho's regulations. *June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2118 (2020), *abrogated by Dobbs*.

In short, statistical analysis and probabilities will not suffice. TST has not met its burden of establishing it has associational standing to bring these claims on behalf of its members because it cannot illustrate to a "relatively clear" degree that any of its members actually meet the requisite criteria. *Cegavske*, 800 F.3d at 1041.

2. *Own Standing*

In like manner, TST has not established that it has standing as an organization *itself* to bring these claims. TST argues it can sue on its own behalf because it is a prescriber of abortifacients and because it devoted significant funds to the Clinic, and both activities have been curtailed by Idaho's laws. Neither argument is persuasive.

Again, TST has not identified any actual women in Idaho who wish to use the Clinic's services to obtain abortifacients and/or utilize its support in performing the Satanic Abortion Ritual. Without such a person, the organization has not actually suffered any concrete injury. And, as outlined above, its speculative position that it is "highly likely" someone in Idaho would use its services but for the current regulations is not sufficient. Dkt. 31, at 5.

Similarly, the fact that TST spent money on the Clinic *in New Mexico* does not prove an actual injury. To be sure, an organization has standing if "it suffered both a diversion of its resources and a frustration of its mission," but it "cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that

otherwise would not affect the organization at all." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (cleaned up). Here, TST opened its Clinic to do precisely what Idaho law forbids, creating a problem "that otherwise would not affect" Plaintiff at all.[9] *Id.*; *see also Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1175–76 (9th Cir. 2022) (finding no injury where Twitter voluntarily incurred costs to respond to a civil investigative demand). Furthermore, Idaho did not cause the alleged injury and, even if it did, the relief requested will not redress it. Said another way, because TST admits it opened the Clinic to respond to *several* states' abortion bans, including Idaho's, whatever happens in Idaho will not make or break the Clinic.

The bottom line is, similar to its problems with associational standing, TST's chain of causation for its own standing is too attenuated.

No injury will occur to TST unless: (1) TST's providers become licensed in Idaho—a necessary step that neither TST nor any of its declarants allege is underway or even planned; (2) a TST member in Idaho becomes "involuntarily pregnant" due to failed birth control; (3) that member chooses to abort her child; and (4) that member selects the Clinic to help perform the abortion, rather than some other abortion provider. Dkt. 30, at 10.

---

[9] TST pushes back on the idea that it manufactured its own injury, asserting it diverted resources to create the Clinic—resources it could have spent elsewhere—and now it cannot reap the benefits of what it created with those resources. Dkt. 40, at 4. But this simply is not true because regardless of what happens in Idaho, the Clinic will (presumably) remain open and (presumably) provide benefits to TST. TST further asserts it is "irrelevant" whether any of its "member[s] in Idaho will use the services of [the Clinic]" because it is not offering those services to Idaho women out of fear of prosecution. *Id.* But fear of prosecution based upon intentions that may or may not materialize is not enough to establish standing because there is no injury. *See Lujan*, 504 U.S. at 564 (explaining that "some day intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the actual or imminent injury") (cleaned up).

MEMORANDUM DECISION AND ORDER – 13

Because this "causal chain involves numerous third parties whose independent decisions collectively have a significant effect on plaintiffs' injuries," it is "too weak to support standing." *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 867 (9th Cir. 2012) (cleaned up).[10]The Court digresses momentarily to highlight an issue in response to the first point above—that TST has not planned to license any of its providers in Idaho. TST avers it has not done so because of the laws currently in place, but that it would be simple to do so; a matter of registering and paying a small fee of $300. TST goes one step further arguing that it really should do this because Idaho's laws are pre-empted by federal laws and illegal. Enter the *GenBioPro* case from TST's supplemental filing.

Because the Court finds the case ultimately unhelpful, it will not delve into the underlying facts and subject matter in detail. TST, however, strongly urged the Court to consider this case and noted that it tried to do the same in other litigation and was denied the opportunity. The Court is not predisposed to address each and every argument raised— even those that are strongly encouraged by counsel—but it feels the need to do so here to explain why the *GenBioPro* case does not support TST's position.

In *GenBioPro*, the Plaintiff (GenBioPro) sued the state of West Virginia because, like Idaho, it enacted limitations on abortions after *Dobbs*, and those limitations burdened GenBioPro's ability to prescribe the abortifacient drugs it manufactured. 2023 WL 5490179. One of the primary issues in that case was the interplay between the Food and Drug

---

[10] Finally, while injunctive relief could potentially redress the purely hypothetical injuries TST claims to have sustained, the Court has already concluded that no such injury actually exists, and even if it did, that the causal link between it and Defendants' actions is too attenuated to support standing. Thus, TST has a redressability problem as well.

Administration's Risk Evaluation and Mitigation Strategy ("REMS") that allowed these drugs to be prescribed, and West Virginia's statute that did not allow the same. *Id.* Thus, the Court was presented with a question regarding preemption, or the legal doctrine that allows a higher level of government the ability to limit or overrule the power of a lower level of government. TST's reading of that decision is that the court found preemption applied and the state of West Virginia was *preempted* from enacting statutes that regulated the prescription of abortifacients and the Court should make a similar finding here today. The Court has a few problems with this argument.

First, this specific issue isn't squarely before the Court today. The parties have not extensively briefed or argued Idaho's bans on prescribing abortifacients; the arguments here are more about performing abortions in general. To be fair, abortifacients are part and parcel to the process of performing abortions. But the Court's point is that, to a large degree, the specific regulations surrounding the prescribing of abortifacients in Idaho have not been fleshed out by the parties.

Second, this decision is from a district court in another circuit. At most, it can only have a persuasive impact on this Court, not a precedential impact. Furthermore, the cited decision is currently on appeal. Accordingly, the Court affords the decision only minimal weight.

Third and most importantly, the *GenBioPro* decision isn't as straightforward as TST posits. Setting aside multiple nuances discussed in that decision, the Court notes some observations. To begin, that court did *not* wholesale conclude that West Virginia's statues regarding abortifacient drugs were pre-empted by federal laws or statutes. To the contrary,

it specifically found that "Congress has not expressed an intent to occupy the field of drugs subject to a REMS in a manner which would preempt West Virginia's abortion restrictions." 2023 WL 5490179, at *10. What it did determine, however, was that certain REMS that allowed abortifacients to be prescribed over the phone *did* preempt West Virginia's statues specifically related to "telemedicine." *Id*. at *10–11. The problem, however, was an injunction regarding those telemedicine REMS was already in place. In *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 223 (5th Cir. 2023), the Fifth Circuit enjoined the FDA's REMS that allowed the prescription of abortifacients via telemedicine. The Supreme Court recently granted cert on the case. *Danco Lab'ys, L.L.C. v. All. Hippocratic Med.,* 2023 WL 8605744, at *1 (U.S. Dec. 13, 2023). Because of the Fifth Circuit stay, the *GenBioPro* court did not conclusively decide the matter since doing so would constitute "an advisory opinion as to the constitutionality of a law not presently operative." *Id*. at 11. So, somewhat contrary to TST's argument, that case does not support the notion that Idaho's laws regarding telemedicine are unconstitutional.

Thus, for the reasons described above, the Court finds the *GenBioPro* case unhelpful to its present analysis. It is from a district court in another circuit and the outcome is speculative at best considering the matter is on appeal. That case, therefore, does not aid TST in its efforts to assert organizational standing on behalf of nurses or doctors who may or may not want to register in Idaho in the hopes of prescribing abortifacients over the phone.

The Court returns to the broader picture and concludes that TST lacks organizational standing because it has failed to show injury in fact, causation, and redressability.

This alone warrants dismissal. The case previously referenced out of Indiana was dismissed entirely on the basis of standing, without leave to amend, and without any commentary as to the merits of the arguments in support of dismissal. <u>Rokita</u>, 2023 WL 7016211, at *11 ("Accordingly, the Court **DISMISSES** the First Amended Complaint for lack of jurisdiction without leave to amend.") (emphasis and bolding in original).

In this case, however, to provide additional support for dismissal, the Court will briefly address the merits of TST's causes of action and Defendants' arguments in support of dismissal.

### C. Claims for Relief

*1.  Takings Claim*

In its first cause of action, TST alleges Defendants have "conscripted" women's bodies "without [their] consent" and taken their property—"the use of her uterus—without compensation in violation of the Takings Clause." Dkt. 30, at 8. It asserts that after the advent of in vitro fertilization and gestational surrogacy as a means of achieving pregnancy, it is clear a woman's uterus is "property." *Id.* at 4. It contends this "property" can be disposed of (via hysterectomy) or gifted/sold/leased (via surrogacy). *Id.* This is an interesting argument. But interesting as it may be, it is not legally sound.

The Takings Clause provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V.[11] Since the Takings Clause does

---

[11] Neither side addresses the "public use" aspect of a regulatory taking. Even assuming TST's argument that a uterus was property, preventing abortion is not "taking" for "public use." The public, in and of itself, has no use for the uterine space. Again, this is where framing is important. The regulations here deal with abortion, not property.

not define "property," *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 164 (1998), courts "draw[] on existing rules or understandings about property rights" to give content to the Clause. *Tyler v. Hennepin Cnty., Minn*., 598 U.S. 631,638 (cleaned up). Courts thus look to state law, "traditional property law principles," historical practice, and Supreme Court precedent. *Id*.; *see also Phillips*, 524 U.S. at 165–68.

None of these helpful guides support the view that a pregnant woman's "uterus" is property taken by the State unless she is permitted "to reclaim it by abortion" as TST contends. Dkt. 30, at 16. To the contrary, these non-binding sources show that the Anglo-American legal tradition has consistently viewed abortion as a crime—not as a property taking. *See Dobbs*, 142 S. Ct. at 2249.

First, traditional principles. The common law viewed life as "the immediate gift of God, a right inherent in every individual." 1 Sir William Blackstone, Commentaries on the Laws of England: The Rights of Persons, bk. 1, ch. 1, at 125.[12] If the common law recognized any property rights in this area, it was the property rights of the unborn child. A child still in the womb could have a legal guardian and could receive an estate. *See* 1 Blackstone, at 125–26.

Second, applicable state law. Like the broader United States historical tradition, Idaho treats unborn life as worthy of protection and endowed with distinct rights. *See, e.g.,* Idaho Code § 18-8802(1) (outlining that "preborn children have interests in life, health, and well-being . . . ."). It has never recognized a property right for a woman to abort a child.

---

[12] Yale Law School, The Avalon Project, https://tinyurl.com/k67xs8ju.

Furthermore, while Idaho does have laws governing such things as human tissues, transplantable organs, blood, and dead bodies, those statutes view those biological materials as unique and specific objects with specific regulations for gifting and/or donating the same. None of the statutes, however, indicate these materials are subject to general laws of personal property as TST advocates. *See, e.g.,* Idaho Code § 39-3412.

Third and finally, nothing in the Supreme Court's Takings Clause jurisprudence provides support for TST's view here. *Tyler*, 598 U.S. 631. As *Dobbs* made clear, "[t]he Constitution makes no reference to abortion, and no such right is implicitly protected by any constitutional provision." 142 S. Ct. at 2242 (emphasis added). There is no right to an abortion under the constitution, let alone a right to do so vis-à-vis the Takings Clause.

TST argues Defendants have "commandeer[ed] the uterus but provide nothing in return—other than jail if the mother tries to reclaim it by abortion." Dkt. 30, at 22. But Defendants do no such thing. The regulations at issue discuss abortion, not property. And there is no persuasive authority suggesting a woman's uterus is property subject to the same considerations and economic uses other traditionally-understood property holds. Thus, history, tradition, and precedent require dismissal of TST's Takings Clause claim.

### 2. *Involuntary Servitude*

TST's second cause of action alleges Defendants subject women to "involuntary servitude in violation of the Thirteenth Amendment" when they force them to "remain pregnant and give birth without [] consent." Dkt. 30, at 8.

The Thirteenth Amendment provides that "[n]either slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly

convicted, shall exist within the United States, or any place subject to their jurisdiction," U.S. Const. amend. XIII, § 1 and that "Congress shall have power to enforce this article by appropriate legislation." *Id*., § 2. In other words, the Thirteenth Amendment "abolished slavery," *Civil Rights Cases*, 109 U.S. 3, 20 (1883) and "those forms of compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results." *United States v. Kozminski*, 487 U.S. 931, 942 (1988) (citation omitted).

Fundamentally, the Court struggles with TST's argument on this front (and implied in other arguments as well). It consistently asserts that involuntarily pregnant women did not "consent" to being pregnant and that they have a "fundamental right to engage in protected sex." Dkt. 30, at 8, 12. The Court will get to fundamental rights in a moment, but notes here that the notion of becoming pregnant after having sex—even protected sex—is not some far-fetched anomaly. As the whole of humanity understands, pregnancy is a potential, natural, understood, and often expected consequence of having sex.[13] So to say a woman has not "consented" to getting pregnant after undertaking an act that is fully capable of bringing about that exact result is somewhat disingenuous.[14] Regardless, however, the point is that Defendants do not regulate *getting* pregnant in any way. They do not infringe on a women's ability to have sex in any way. And becoming pregnant is not a

---

[13] TST makes the further outlandish claim that "there is [] a profound Constitutional question of whether a woman who engages in sex without Birth Control thereby consents to the creation of a Prenatal Person in her body." Dkt. 30, at 13n.5. General laws of science dictate the answer to that question.

[14] The Court is, of course, cognizant of the fact that—as TST repeatedly points out—birth control measures fail, and some pregnancies are unexpected or unplanned. The Court is also not affirmatively saying that "consent to sex is consent to pregnancy." But it has a hard time with TST's argument that women who consent to sex, and that act is followed by a natural result, are "forced" into doing something—akin to involuntary servitude or slavery—that was always plausible in the first place.

consequence imposed by Defendants (especially a consequence analogous to slavery); it's a consequence of science. Defendants are not regulating sex and pregnancy; they are regulating abortion. And they are doing so legally under *Dobbs*.

Women who conceive children through consensual sex do not suffer "the very essence of involuntary servitude outlawed by the Thirteenth Amendment." Dkt. 30 at 28.[15] TST's argument here goes too far. Were the Court to take this logic to its end, it could find that any obligations the law imposes on parents for the support and upbringing of a child would constitute involuntary servitude and justify the termination of the child. Such a result is blatantly absurd. TST's involuntary servitude claim must be dismissed.

### 3. Equal Protection

Third, TST argues that Idaho's laws have a carve out for victims of rape and that this violates the Equal Protection Clause because it treats rape victims better than involuntarily pregnant women.

Setting aside the very obvious difference between a person who becomes pregnant via rape–a *non-consensual* act—and a person who becomes pregnant by accident—a consensual act, albeit with an unintended result—TST still cannot meet its burden.

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It is "essentially a direction that all persons similarly situated

---

[15] TST avers that it is "particularly egregious" to require women to carry unwanted children to term in the "21st Century" where "women have the technological means at their disposal to safely terminate unwanted pregnancies." Dkt. 30, at 28. This may be true. But women also have the technological means, medicine, and knowledge necessary to engage in sex that does not result in pregnancy.

should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The state may not discriminate against classes of people in an "arbitrary or irrational" way or with the "bare . . . desire to harm a politically unpopular group." *Id.* at 446–47. This aspirational promise, however, must coexist with the practical reality that laws often draw lines between groups of people and those lines naturally advantage some groups while disadvantaging others. *Romer v. Evans*, 517 U.S. 620, 631 (1996).

When considering an equal protection claim, the Court must first determine what level of scrutiny applies and then decide whether the policy at issue survives that level of scrutiny.

There are three levels of review: strict scrutiny, intermediate scrutiny, or rational basis review. Laws are subject to strict scrutiny when they discriminate against a suspect class, such as a racial group, *e.g., Grutter v. Bollinger,* 539 U.S. 306, 326 (2003), or when they discriminate based on any classification but impact a fundamental right, such as the right to vote. *See, e.g., Reynolds v. Sims,* 377 U.S. 533, 562 (1964). Laws are subject to intermediate scrutiny when they discriminate based on certain other suspect classifications, such as gender. *Miss. Univ. for Women v. Hogan,* 458 U.S. 718, 723 (1982). When no suspect class is involved and no fundamental right is burdened, Courts apply a rational basis test to determine the legitimacy of the classifications. *Olagues v. Russoniello,* 770 F.2d 791, 802 (9th Cir. 1985).

In this case, the parties disagree on the level of scrutiny the Court must apply: strict, intermediate, or rational basis. TST alleges Defendants are infringing a fundament right—the right to have sex—and, therefore, strict scrutiny applies. For their part, Defendants

MEMORANDUM DECISION AND ORDER – 22

assert no fundamental right is at issue and no suspect class has been established. The Court agrees with Defendants on both fronts.

First, back to framing the arguments in this case. Regardless of whether consensual sex is a fundamental right, Defendants are not infringing on that right because the regulations at issue do not focus on sex; the regulations focus on abortion. And there is no fundamental right to abortion under the Idaho constitution or the United States Constitution.

Second, "involuntarily pregnant women" or "women who engage in sex just for the pleasure and intimacy it brings" are not a protected class. TST never so alleges. And even if the Court were to find the same, that group is not "similarly situated" to the group (victims of rape) supposedly receiving special treatment.[16] And even if the Court were to find TST's members comprised a protected class and were similarly situated to victims of rape, Idaho's regulation is still narrowly tailored[17] to its compelling interests in preventing abortions and protecting victims of criminal conduct. That those two interests overlap (and "leave out" TST members) is not a violation of equal protection, but the reality of living in a pluralistic society. *See Romer,* U.S. at 631.

---

[16] The Idaho Legislature is well within its power to police the welfare of rape victims after a criminal act and also police the interest of the life of the unborn. These are two distinct areas not tied together as closely as TST postures.

[17] Laws that discriminate against a fundamental right or protected class "are presumed unconstitutional and will survive strict scrutiny only when the government can show the law is narrowly tailored to a compelling governmental interest." *Latta v. Otter*, 19 F. Supp 3d 1054, 1073 (D. Idaho 2014). Where rational basis review applies, the Court "presumes the law is valid unless the challenger can show the difference in treatment bears no rational relation to a conceivable government interest." *Id.* Suffice it to say, even under the highest level of scrutiny, TST cannot meet its burden because Idaho's regulations are narrowly tailored to its interests.

### 4.  State law Claims

TST's final cause of action is that Defendants' actions violate the Idaho Exercise of Religious Freedom Act ("IERFA") because they make the exercise of the Satanic Abortion Ritual a crime. Dkt. 15, at 16. This is so because one of TST's seven tenets focuses on the idea that one's own body is inviolable and subject to one's own will alone and the state of Idaho is encroaching upon that belief by dictating that women *cannot* end a pregnancy if they so desire.

In briefing, Defendants asserted this cause of action lacked merit and should be dismissed. TST wholly failed to respond to this assertion. Accordingly, in their reply brief, Defendants asked that the Court dismiss the claim as abandoned. Dkt. 35, at 11. As part of its sur-reply, TST asks the Court to allow it the opportunity to withdraw its IERFA claim and change it to a Free Exercise claim. Dkt. 40, at 8.

As noted, Defendants did not object to TST's sur-reply. But that does not mean they acquiesced to the filing of a second amended complaint or the inclusion of a new cause of action in this case. And at oral argument, Defendants opined that the best course of action would be to dismiss Claim Four in light of TST's acquiesces and then this case would have finality. Then, if TST so desired, it could file another lawsuit alleging a fresh free exercise claim. The Court agrees this is the best approach. TST has already amended its complaint once in this case. Dkt. 15. If it wants to allege any new claims against these Defendants, it can do so in another lawsuit.[18] But as for the claims *in this lawsuit*, each is dismissed with

---

[18] The Court expresses no opinion on the viability of any future claims; only that TST's fourth claim in this case does not withstand muster.

prejudice for the reasons outlined above.

## V. CONCLUSION

The State of Idaho has sovereign immunity and must be dismissed.

TST does not have associational or organizational standing because it: (1) does not identify with any degree of certainty any women who have, or will, suffer injury at the hands of Defendants, and (2) cannot point to any injury it will suffer itself.

TST's claims do not have merit. Trying to muster a takings claim and an involuntary servitude claim out of the facts of this case leaves much to be desired. And there is no equal protection violation here because a fundamental right is not at issue, and even if it were, the statutes are narrowly tailored to Idaho's compelling interests in protecting unborn life and rape victims. The regulations concern abortion; not consensual sex. Finally, TST is voluntarily dismissing its state law claim.

TST avers this case is straightforward. But it is not. Its arguments, while interesting, are convoluted and do not lead to the desired result. And the fact that it now, belatedly, wants to reframe one of its causes of action illustrates the novelty of its arguments. Because TST has already amended its complaint as a matter of right, the Court will not allow further amendment on any of the current claims as no amendment appears likely to save those specific claims. Claims One through Four are, therefore, dismissed with prejudice.

## VI. ORDER

1. Defendants' Motion to Dismiss (Dkt. 23) is GRANTED. Claims One through Four are Dismissed with prejudice and without leave to amend.

2.  The Court will enter a separate judgment in accordance with Federal Rule of Civil

Procedure 58.

DATED: January 31, 2024

David C. Nye
Chief U.S. District Court Judge